UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SHIRON COOPER,**<br><br>　　　　**Plaintiff,**<br><br>v.<br><br>**CITY OF JERSEY CITY; JERSEY CITY POLICE DEPARTMENT; JOHN RANSOM; PATRICK EGAN;**<br><br>　　　　**Defendants.** | Civ. No. 18-9200 (KM) (MAH)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

　　This matter comes before the Court on the motion (DE 42) of defendants City of Jersey City, Jersey City Police Department, and a police officer, Patrick Egan ("Defendants")[1] for summary judgment. For the reasons set forth below, the motion is **GRANTED in part and DENIED in part.**

---

[1] Defendant John Ransom, a police sergeant at the time of the events, has not moved for summary judgment. For the purposes of this Opinion, "Defendants" refers to the movants and does not refer to Ransom.

　　As the complaint points out, the Jersey City Police Department is a municipal subdivision and arm of city government. (Compl. at ¶ 5) As such, a New Jersey police department is not a separate legal entity with the capacity to sue or be sued. N.J. Stat. Ann. § 40A:14-118 (municipal police department is "an executive and enforcement function of municipal government"). *See Mitchell v. City of Jersey City*, No. 15-CV-6907 (KM), 2016 WL 1381379, at *1 (D.N.J. Apr. 7, 2016); *McGovern v. Jersey City*, No. 98-CV-5186 2006 WL 42236, at *7 n.4 (D.N.J. Jan. 6, 2006) (police departments cannot be sued in conjunction with municipalities because police departments are administrative arms of local municipalities, not separate entities); *see also Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004) (same). For claims involving the Police Department, the proper defendant is the City itself, which is separately named in this complaint. I will therefore dismiss the Jersey City Police Department as a defendant. The correction is technical; the substance of the action is not affected.

I. **Background**[2]

On August 6, 2017, Defendant Sergeant John Ransom was driving a police vehicle that struck Plaintiff Shiron Cooper.[3] At the time, Cooper was on foot fleeing from the police. Ransom testified that on the night of the incident, he was working as a supervisor, with a squad of officers that included Defendant Patrick Egan, on a shift from 6 pm to 2 am. (DSOF ¶ 9-10.) The officers set up a surveillance post in Jersey City, planning to arrest individuals buying or selling illegal drugs. (PSOF ¶ 3.) Ransom was part of a unit responsible for picking up persons observed buying or selling illegal drugs,

---

[2] For ease of reference, certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| "DE_" | = | Docket Entry in this Case |
| "Compl." | = | Complaint (DE 1) |
| "DSOF" | = | Defendants' statement of material facts (DE 42-1) |
| "PSOF" | = | Plaintiff's statement of material facts (DE 46) |
| "Def. Brf." | = | Memorandum of Law in Support of Defendants' Motion for Summary Judgment (DE 42-2) |
| "Pl. Brf." | = | Memorandum of Law in Opposition to Defendants' Motion (DE 45) |
| "Def. Reply" | = | Reply Memorandum of Law (DE 50) |

[3] The parties have, pursuant to Rule 56.1, each submitted statements of facts. Accordingly, I summarize the facts as presented by the parties, indicating where necessary which facts are disputed.

I also note that Defendants' statement of facts often refers to what "Plaintiff claims" or what a particular person "testified," rather than stating underlying facts. For example, at Paragraph 6, Defendants state that "Plaintiff claims that the vehicle which hit him on August 6, 2017, an unmarked Dodge Durango, was operated by defendant, on-duty Jersey City Police Sergeant John Ransom." DSOF ¶ 6. Of course, it is undisputed that Plaintiff is *claiming* this. From Defendants' statement of facts, however, it is not clear whether Defendants are admitting that Plaintiff was hit by a vehicle operated by Ransom (although I believe they are). For purposes of this motion, I treat such underlying facts as undisputed, except as where it is made clear from the parties' briefing that a fact is in dispute.

while Egan served as a "surveillance officer," responsible for providing Ransom a description of the person buying illegal drugs. (DSOF ¶¶ 12-15.) Egan observed Cooper receive money from another individual and hand that individual a small white object. (DSOF ¶ 18.) Egan communicated with Ransom and the other officers over radio. (DSOF ¶¶ 19, 20.)

Ransom then began to pursue Cooper in a Dodge Durango SUV issued by the police department. (DSOF ¶ 6, 22.) Ransom spotted Cooper in the yard of a house and exited his vehicle. (DSOF ¶ 26.) Ransom testified that he observed Cooper reaching into his waistband, but that Cooper then ran off again and Ransom lost sight of him. Another officer radioed his location and Ransom then observed Cooper running into Audubon Park. (DSOF ¶¶ 26-28.) Ransom drove into Audubon Park with the vehicle's lights and sirens activated. (DSOF ¶ 29.)

Ransom testified that his vehicle made contact with Cooper and Cooper bounced back from the contact and began running again. (DSOF ¶30.) Ransom resumed his pursuit of Cooper in his vehicle. (DSOF ¶ 32.) Ransom testified that he lost sight of Cooper, parked the car, and got out. (DSOF ¶ 33.) When he walked to the back of the vehicle, he saw Cooper lying in the grass near the car. (DSOF ¶ 34.)

Cooper, on the other hand, states that Ransom hit him with the vehicle a second time. (PSOF ¶ 53.) Cooper states that he was pulled underneath the car and remained there until he was arrested. Ransom denied that Cooper was ever under the car. (PSOF ¶¶ 56-57.) Ransom arrested Cooper and then called an ambulance for him. (DSOF ¶¶ 35,36.)

Egan states that meanwhile, after he observed the drug transaction, he, too, attempted to pursue Cooper. (DSOF ¶ 37.) He saw Cooper throw a white object which was later identified as heroin. (DSOF ¶ 38.) Egan states that he lost sight of Cooper and eventually walked to Audubon Park where he saw an ambulance departing the scene. (DSOF ¶¶ 39-40.) The parties dispute whether Egan was in Audubon Park at the same time as Cooper. (DSOF ¶ 43; PSOF ¶ 43.) Egan wrote a police report. He testified that everything in the report about

the initial drug transaction was based on what he observed, but that everything regarding the vehicle accident was based upon information he received from Ransom. (DSOF ¶¶ 44-45.) Ransom told Egan that Cooper had run into his vehicle and bounced backward. (DSOF ¶ 49.)

Howard Berg, plaintiff's medical expert, testified that "[Cooper] did sustain a right orbital fracture which has healed spontaneously with no residual sequalae. In reference to [Cooper's] complaint of hearing loss; the audiogram taken in my office shows normal pure-tone hearing with 100% speech discrimination and as such no documented hearing loss." (Def. Brf., Ex. H ("Berg Report") at 2-3.)

After investigation, Ransom was charged with fourth-degree Assault by Auto. (PSOF ¶ 108.) Ransom pleaded guilty to Simple Assault. (Def. Brf, Exhibit G.) He no longer works for the Jersey City Police Department. (PSOF ¶ 109.)

Cooper sued Ransom, Egan, City of Jersey City, and Jersey City Police Department. The City, the Police Department, and Egan now move for summary judgment. Cooper states in his opposition brief that he has decided to forgo the following claims: 42 U.S.C. § 1981 (Count II), 42 U.S.C. § 1986 (Count IV), and willful disregard (Count VII). (Pl. Brf. at 1 n.2.) I therefore grant summary judgment for Defendants on Counts II, IV, and VII, and will not discuss them further.

The following counts remain:

| | |
|---|---|
| Count I: | 42 U.S.C. § 1983 |
| Count III: | 42 U.S.C. § 1985 |
| Count V: | 42 U.S.C. § 1983 for negligent screening, hiring, training, supervising and retention |
| Count VI: | New Jersey Civil Rights Act and New Jersey State Constitution |
| Count VIII: | Assault and Battery |

**II.    Standard of Review**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable

inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

### III. Discussion

#### a. *Monell* Claims against the City

Counts V and VI allege violations of the New Jersey Civil Rights Act ("NJCRA") and 42 US.C. § 1983 by the Jersey City Police Department and the City of Jersey City (for simplicity, the "City"). For constitutional torts, whether under § 1983 or the analogous provisions of the NJCRA, there is no respondeat superior liability as such. Municipal liability for the acts of employees must be premised on the doctrine of *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). *See Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1358–61, 179 L.Ed.2d 417 (2011); *Mulholland v. Gov't Cnty. of Berks*, Pa., 706 F.3d 227, 237 (3d Cir. 2013).

In order to establish a prima facie case of *Monell* liability, the plaintiff must "(i) demonstrate the existence of an unlawful policy or custom; (ii) that resulted in a deprivation of the rights, privileges, or immunities secured by the Constitution or laws of the United States; and (iii) that the policy or custom was the proximate cause of the alleged deprivation." *Maldonado v. City of Passaic Bd. of Educ.*, No. CV1712245ESJAD, 2020 WL 289649, at *7 (D.N.J. Jan. 21, 2020) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A government policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Beck, 89 F.3d at 971 (quoting *Bielevicz*, 915 F.2d 845, 850 (3d Cir. 1990)). In contrast, "a course of conduct is considered to

be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Id.*

I will take Cooper's three *Monell* theories in turn. For the reasons stated below, I find that no reasonable jury could find for Cooper on his custom or failure-to-train theory, but that a reasonable jury could find for Cooper on his failure-to-investigate theory. Finding a genuine, material issue of fact, I therefore deny summary judgment on this count.

### i. Custom of "Cutting Off" Fleeing Pedestrians

I first turn to Cooper's claim that the City has an ongoing policy or custom of using police vehicles to cut off fleeing pedestrian-suspects, and that this custom or policy resulted in the violation of Cooper's rights.[4] (Pl. Brf. at 17.) Cooper further asserts that the City knew or should have known that there was a substantial risk of serious harm to pedestrian-suspects because of the policy. (Pl. Brf. at 17.)

To support this argument, Cooper points to the deposition of Morgan Torres, a lieutenant with Jersey City Police Department and use-of-force expert. (Pl. Brf. at 18.) Torres testified that foot pursuits are a common occurrence in Jersey City and that in "most" foot pursuits, one officer will pursue the suspect on foot while another officer tries to head off the suspect with a car. (Pl. Brf., Ex. 5 ("Torres Dep.") at 50:7-54:7.) Torres testified that this sort of pursuit is routine and is "taught at the academy." (Torres Dep. at 50:15-17, 52:3.) While Cooper has not located this practice in any "official proclamation, policy, or edict," *Beck*, 89 F.3d at 971, Torres's testimony suggests that it is permanent and well-settled enough to constitute a custom. To be clear, Torres's testimony does not suggest that the custom is to strike

---

[4] Ransom did not move for summary judgment, and the moving defendants do not dispute that Ransom's conduct amounted to the excessive use of force. For purposes of this motion, therefore, it is not necessary to analyze the underlying constitutional violation; the issue is only whether, assuming such a violation occurred, the City may be liable for it.

7

fleeing pedestrians, but rather to use a vehicle to block the pedestrians' path. (Torres Dep at 50:23-51:10, 62:14-21, 63:13-20.)

In reply, Defendants do not seem to dispute that this practice exists, but counter that Cooper has not shown the maneuver to be improper or unsafe. (Def. Reply at 2-3.) The parties do agree that hitting a suspect with a police vehicle would be considered a use of deadly force. (Def. Reply at 3; Pl. Brf. at 13.) Cooper argues that a reasonable jury could conclude that the custom of cutting off fleeing pedestrians, even if not unconstitutional in itself, creates a high likelihood of officers striking pedestrians with their vehicles. (Pl. Brf. at 19.) *Monell* liability is imposed "when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir.1991)). If "the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (internal quotations omitted) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, (1997)).

The facts as presented do not raise a triable issue that the custom at issue facially violates federal law or creates such a high likelihood of the unconstitutional use of excessive force that the City is liable for Ransom's car striking Cooper. Cooper relies on Torres's testimony, but Torres testified that this is a safe practice which does not require any particular training beyond knowing how to drive. (Torres Dep. at 63:10-23.) Torres explained that proper execution of this maneuver is "no different than you driving a regular car and passing another vehicle." (Torres Dep. at 63:13-20.)

Cooper has not met his burden of identifying facts that show this custom is unconstitutional or would lead to a high likelihood of the unconstitutional use of excessive force. Cooper has not put forth any evidence, such as

8

testimony of his own expert, establishing that the practice is improper, or evidence that the practice is considered unsafe in other departments. There is of course some irreducible level of danger associated with the apprehension of fleeing suspects, but that is a core function of the police. On the record before me, it seems reasonable to do so by following the fleeing suspect in a motor vehicle and stopping the vehicle in the suspect's path. What happened to Cooper appears on the record to be the result of one officer's actions or negligence, rather than the obvious consequence of an unconstitutional departmental custom or policy.

### ii.  Failure to Train

I next consider the failure-to-train theory of liability. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). "[T]he identified deficiency in a city's training program must be closely related to the ultimate injury;" or in other words, "the deficiency in training [must have] actually caused" the constitutional violation. *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Canton*, 489 U.S. at 391). The Supreme Court has also noted that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citation omitted). Nevertheless, in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" even without a pattern of constitutional violations. *Thomas* (citing *Canton*, 489 U.S. at 390 n. 10).

Cooper argues that because the City had a custom of using police vehicles to cut off pedestrians, the City was responsible for training officers to avoid highly predictable and dangerous consequences of doing so. (Pl. Brf. at 22.) Cooper, however, has not shown any pattern of alleged constitutional

9

violations resulting from the custom at issue. He has shown two instances of a pedestrian being struck by a police vehicle—the incident that gave rise to this suit and a complaint from 2006—and both times, Ransom was the officer responsible. (Pl. Brf., Ex. 28.) While that is taken into account in the failure-to-discipline discussion below, it is not enough here to constitute a pattern of "similar constitutional violations by untrained employees." Indeed, that the common factor in both cases was Ransom tends to reinforce the conclusion that he, and not the policy, was to blame.

Following *Berg*, although it is possible to maintain a claim of failure to train without demonstrating a pattern of violations, the "burden on the plaintiff in such a case is high." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). The hypothetical possibility that a pedestrian could be struck is not enough to meet Plaintiff's burden. As explained above, Torres testified that this custom is safe and requires no specific training, and Cooper has not pointed to any facts which contradict that testimony.

### iii. Failure to Investigate

Finally, I consider Cooper's argument that there was a more general custom of acquiescing in the use of excessive force, which resulted in Cooper's injury. In general, to survive summary judgment on a "custom" case predicated on the inadequate investigation of excessive force complaints, a plaintiff needs to present statistical evidence of a pattern of behavior by the department. *See Shuman v. Raritan Twp.*, No. CV143658FLWLHG, 2016 WL 7013465, at *23 (D.N.J. Nov. 30, 2016) (collecting cases). Even so, "[i]solated and without further context, however, statistical evidence alone may not justify a jury's finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers. . . . Rather than reciting a number of complaints or offenses, a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (citations omitted). In *Beck v. City of Pittsburgh*, the Third Circuit held

10

that a jury could conclude that the municipality should have known of an officer's violent tendencies where five excessive force complaints were filed against him in a five-year period. 89 F.3d 966 (3d Cir. 1996). The Court emphasized the similarity and temporal proximity of the five complaints against the officer. *Id* at 973.

With regard to the City's investigatory processes, Cooper does not point to an explicit or affirmative policy. Instead, he argues that the department's failure to investigate or sustain excessive force complaints against Ransom and other officers led to the assault on Cooper, and that the City is therefore liable. (Pl. Brf. 26-27.) Cooper concedes that complaints were investigated, but he argues that they were too often not sustained, so his argument may be better described as a failure to *adequately* investigate or adjudicate excessive force complaints. In the five-year period preceding Plaintiff's assault, there were approximately 166 use of force complaints investigated by the Jersey City Police Department Internal Affairs Unit ("IAU"). (Pl. Brf., Exhibit 4 at 103:9-25.) Cooper asserts that only one of the 166 complaints was sustained; the other 165 resulted in findings of exonerated, not sustained, or administratively closed.[5] (*Id.* at 103:14 -108:16.) Such numbers, though suggestive, are insufficient to defeat summary judgment. *See Katzenmoyer v. Camden Police Dep't*, No. CIV. 08-1995 RBK/JS, 2012 WL 6691746, at *5 (D.N.J. Dec. 21, 2012) (granting summary judgment in favor of defendants where plaintiff showed that out of 641 complaints, only one was sustained).

But there is more here. Focusing on Ransom in particular, there were a total of seven excessive use of force investigations involving Ransom in a five-year period. (Pl. Brf. Ex. 20-26.) Cooper points to four complaints of excessive force against Ransom to "show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one."

---

[5] It is unclear from the deposition testimony cited whether some of those complaints were missing conclusions or pages and therefore had some unknown disposition. (Pl. Brf., Exhibit 4 at 103:14 -108:16.)

11

*Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010). Both *Merman* and *Beck* found a genuine issue of material fact relating to the adequacy of an investigatory system where, among other facts, the investigative agency did not consider prior or similar complaints against a particular officer and assumed the credibility of officer's testimony while discounting the credibility of witnesses associated with the complainant. *Merman v. City of Camden*, 824 F. Supp. 2d 581, 592 (D.N.J. 2010) (citing *Beck*, 89 F.3d at 973). Further, the Court in *Merman* noted that the reports tended to conclude no finding of misconduct could be made where there were discrepancies in accounts and placed weight on the fact that that some complainants were charged with or were guilty of an offense. *Id.* While it would have been helpful for plaintiff to present expert analysis on the inadequacy of these investigations, I will here perform my own review of those complaints. (Pl. Brf. Exhibits 20, 25, 29, 24.)

      The first, filed in 2014, involved an allegation that Ransom shoved the complainant against a fence and dragged him to the ground. (Pl. Brf., Ex. 20 at 2.) The complainant withdrew the complaint, stating that he had "struck a deal" with the prosecutor that the charge against him would be dropped if he withdrew his complaint against Ransom. (*Id.* at 4.) The complaint was marked as "not sustained" and "exonerated, proper conduct & policy." (*Id.*) The report notes that the complainant's "withdrawal of his complaint also tilts the scale in favor of Sgt. Ransom as [complainant] at some level must know that he was culpable in escalating what should have been a routine investigatory detention into his own arrest." (*Id.* at 7.)

      Another complaint, filed in 2018, alleged that the complainant, while in custody, slipped on steps and Ransom kicked him twice in the head. (Pl. Brf., Ex. 25 at 3.) While video cameras did not capture the incident, they did show Ransom pushing the complaint in the chest when putting him in a holding cell, which another officer stated he "felt was unnecessary." (*Id.* at 4.) In part because the complainant did not follow up with the investigation after asking

to reschedule his interview, the complaint was not sustained. (*Id.* at 8.) Defendants argue that there were "significant" issues with that complainant's credibility. Primarily, they seem to argue that, in the surveillance video, he appeared agitated, as opposed to cooperative as he had claimed, and that he claimed his arrest was in retaliation for the arrest of an officer's brother by the complainant's girlfriend, herself a police officer. (Def. Reply at 10.) The report concluded that the complainant's girlfriend did not arrest the person in question. The initial investigation by the Hudson County Prosecutors confirmed the arrest of a person by that name, but could not confirm the sibling relationship between the arrestee and the officer. (Pl. Brf., Ex. 25 at 15.)

Regarding a complaint filed in 2007, Cooper asserts that the IAU ignored clear medical evidence consistent with the complainant's story. (Pl. Brf. at 32.) That complainant alleged that officers grabbed him by the hair, slammed his head against the wall, and kicked his legs open. An officer then punched him in the stomach hard enough to cause him to defecate. (Pl. Brf, Ex. 29 at 3.) Ransom and his partner both denied the complainant's allegations. (*Id.* at 5.) However, medical records from a hospital showed that the complainant was treated for abdominal pain later that day and that he stated he had been assaulted two hours earlier. He was diagnosed with blunt trauma to the stomach. (*Id.* at 4.) The report notes the complainant's criminal history. (*Id.* at 4.) The complaint was deemed "not sustained." (*Id.* at 5.) Defendants point out that the complainant was not able to identify Ransom and that he failed to provide the IAU with full names and contact information for eyewitnesses. (Def. Reply at 8-9.)

Cooper also points to a 2016 complaint in which a complainant alleged that Ransom punched him in the face during a traffic stop. (Pl. Brf., Ex. 24.) Complaint's mug shot however did not show signs of "bleeding, cuts, scrapes, open wounds, bruises, or swelling" to the complainant's face. (*Id.* at 7.) Two sets of letters were sent to a witness, via certified and regular mail, but there

was no proof of delivery. (Id. at 5.) The complaint was deemed exonerated. (*Id.* at 10.)

On September 15, 2006, a complaint was filed stating that Ransom struck a fleeing pedestrian with his police vehicle. (Pl. Brf., Exhibit 28.) One witness stated that the "police ran up on the curb and hit" the pedestrian, who was then arrested. (*Id.* at 3.) The report states that three interviews were conducted, but that there were "numerous inconsistencies" among them. (*Id.* at 4.) The charge of excessive force against Ransom was therefore deemed not sustained. (*Id.* at 6.) All three witnesses, however, stated that the pedestrian was struck by a police vehicle. I note the similarity between this complaint and the incident at issue.

In further support of Cooper's "custom" argument is the testimony of Officer George Rotondo, a captain at the IAU, (a) that there is a "stigma" to working for IAU and (b) that an officer's disciplinary history is not normally taken into consideration regarding promotion because Jersey City is a civil service department. (Pl. Brf., Exhibit 4 at 22:24-23:23 150:16-25.) Cooper also provides an NJ.com article titled "Jersey City might not be reporting every time a cop uses force" which states that the Jersey City police chief "has conceded it is possible his officers are using more force when making arrests than publicly reported." (Pl. Brf., Ex. 34.)

Defendants point out that there is no testimony demonstrating deficiencies in the IAU investigation procedures and that there was a formalized system of tracking complaints in place. (Def. Reply at 13.) Defendants also assert that investigators made earnest attempts to obtain statements from witnesses, but for three of the complaints against Ransom, the witnesses or complainant could not be contacted. For example, in relation to the 2016 complaint, two sets of letters were sent to a witness, via certified and regular mail, but proof of delivery was never forthcoming (one was returned and the status of the other never updated to delivered). (Ex. 25 at 5.) As in *Merman* and *Berg,* these complaints do not mention Ransom's past history of

civilian complaints and often conclude that no finding of misconduct can be made, for lack of witnesses. *Merman*, 824 F. Supp. 2d at 592. In the 2014, 2018, 2007, and 2006 complaints, it appears that the officers' testimony is credited over the complainant's testimony, even where there is no corroborating evidence, or the objective evidence appears to support the complainants' version.

The "mere existence of superficial grievance procedures" is not enough to guarantee that citizens' constitutional liberties are secure. *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996). Instead, we must look to the substance, and whether that substance is adequate is for a jury's consideration. *Id.*

I find that Cooper has provided sufficient evidence from which a reasonable jury *could* conclude—although it would not have to—that the City was deliberately indifferent in investigating claims of excessive force. That a large number of complaints were filed and only one sustained merely sets the scene. Ransom in particular faced multiple prior excessive force complaints, one of them for very similar conduct, *i.e.*, striking a fleeing pedestrian with his vehicle. Such evidence is sufficient to raise a triable issue as to whether the City knew about and acquiesced in a custom tolerating the use of excessive force, and its use by Ransom in particular. *Monaco v. City of Camden*, 2008 WL 8738213, at *9 (D.N.J. Apr. 14, 2008) ("[I]f, as Plaintiff argues, the City failed to conduct adequate investigations into excessive force complaints, then a heightened inclination of police officers to use excessive force would be a 'highly predictable consequence' of the City's inaction." (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997))). Of course, a jury could find that the evidence does not show an unconstitutional custom, or that such a custom did not cause Cooper's injury. But the purpose of summary judgment is to identify, not to resolve, such factual issues, which are for the jury.

### b. Count III (§ 1985 Conspiracy)

Count III alleges a conspiracy under 42 U.S.C § 1985. Section 1985 is a federal statute which provides civil remedies for a conspiracy which deprives a person of civil rights. It is unclear from Cooper's complaint or opposition brief whether he raises claims under 42 U.S.C. § 1985(2) or (3). Section 1985(2) prohibits conspiracies to obstruct justice with the intent to deny equal protection of the laws. A claim under § 1985(3) requires a plaintiff to demonstrate: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Mosca v. Cole*, 384 F. Supp. 2d 757, 769 (D.N.J. 2005), aff'd, 217 F. App'x 158 (3d Cir. 2007) (citing *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997). Both subsections, however, require a plaintiff to demonstrate that there was a race-based motive for the defendants' alleged actions. *Limehouse v. Delaware*, 144 F. App'x 921, 923 (3d Cir. 2005) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Davis v. Township of Hillside*, 190 F.3d 167, 171 (3d Cir.1999)). Cooper's opposition brief does not point to any facts from which a reasonable jury could conclude that Ransom and Egan had a race-based motive. Summary judgment is therefore granted in favor of the Defendants on Count III.

### c. Count I (§ 1983)

Count I alleges a deprivation of civil rights under 42 US.C. § 1983. The liability of the principal actor, Ransom, for use of excessive force is not at issue on this motion. The issue is whether Egan, too, is liable under § 1983.[6] Here, matters get confused. The theory in Plaintiff's brief is that Egan conspired to violate his rights by authoring a false police report that covered up Ransom's

---

[6] Plaintiff's brief states that his theory of liability here is conspiracy. He "withdraws his conspiracy claims against the City Defendants but maintains that Egan remains liable to Plaintiff for the same." (Pl. Brf. at 36.)

16

use of excessive force. That is not alleged, however, in Count I. Defendants argue that Plaintiff has mixed up the § 1983 and § 1985 standards, and that the only conspiracy claim pled is under § 1985. (Def. Reply at 13-14.)

Count I is labeled "violation of 42 U.S.C. § 1983." It alleges that the "[Police Officer] Defendants individually and as a group participated and conspired with one another, under color of state law, to deprive Plaintiff of his constitutional rights." (Compl. at ¶ 48.)[7] The principal actor would be Ransom, not a movant here. The only substantive act referred to in Count I is Ransom's use of excessive force. The Count's prayer for damages refers to "aforesaid acts by Defendants." (Compl. ¶ 54.)

Defendants (albeit in relation to § 1985, since they do not acknowledge that a conspiracy was alleged under § 1983), argue that no reasonable jury could conclude that Ransom and Egan entered into a cover-up agreement. There is no evidence, they state, that Egan was present when Cooper was struck by the vehicle; his report merely related information given to him by Ransom.

Because Defendants rest on their assertion that there is no § 1983 claim involving a conspiracy with Egan, I do not have the benefit of full adversarial briefing. Cooper appears largely to attack Egan's credibility in general. He does not seem to adduce any positive evidence that Egan purposely falsified his report to further Ransom's violation of Cooper's civil rights.

The parties' arguments and citations to evidence are not sufficient to permit me to grant the summary judgment motion on Count I in relation to defendant Egan. I will, however, authorize a supplemental, focused summary judgment motion by defendant Egan only, directed to Count I; assuming that Count I could be amended to allege the conspiratorial filing of a false police

---

[7]  The theory of the City's liability must be a *Monell* claim. That would be duplicative of Count V, discussed above. I therefore excise it from Count I, to the extent it was intended at all. (Count I refers to the Police Officer Defendants, but not to the City.)

report; and discussing whether the evidence raises a genuine, material issue of fact as to that issue.

### d. Count VIII (Assault and Battery)

Defendants argue that Count VIII should be dismissed under the New Jersey Tort Claims Act ("NJTCA") because Cooper has not suffered a permanent injury. Because Plaintiff's brief in opposition does not respond to Defendants' argument, I treat the point as having been waived. I will interpret Count VIII as being directed against Ransom only.[8] Summary judgment is therefore granted to the moving Defendants on Count VIII.

### e. Crossclaim (Indemnification)

The moving Defendants have also filed for summary judgment of Ransom's crossclaim for indemnification. That crossclaim alleges that Ransom's "negligence, if any, was not morally culpable, but was merely constructive, technical, imputed or vicarious, and that Plaintiff's damages arose through the direct and primary negligence of the co-defendants." (DE 11 at 11.) Ransom did not file an opposition brief or otherwise respond to the motion. The court's review of the record does not suggest that Ransom's liability was anything but direct and primary. For that reason, and because he

---

[8] Ransom is the person alleged to have committed the act of assault. Count VIII refers to the acts of Ransom "and perhaps others," and refers in conclusory fashion to "Defendants, individually and/or acting in concert." (Compl. ¶¶ 78, 80.) Such boilerplate references in pleadings do not suffice to repel a motion for summary judgment. Plaintiff has not cited or marshaled evidence of concerted tortious action, and the Court will not do so on his behalf.

I note for future reference, however, that, even as to Ransom, the New Jersey Tort Claims Act would not bar liability outright; it acts only to bar damages for pain and suffering. *See* N.J. Stat. Ann. § 59:9-2(d) ("No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.") Cooper has not provided evidence that his injuries resulted in permanent loss of bodily function. (*See* Def. Brf., Ex. C at 110:19-24, 111:4-8; Def. Brf., Ex. H at 2-3.)

has failed to respond, the motion for summary judgment on Ransom's crossclaim is granted.

### IV. Conclusion

Defendants' motion for summary judgment (DE 42) is granted in part and denied in part, as follows:

Defendant Jersey City Police Department is dismissed from the case.

On Count II (42 U.S.C. § 1981), Count IV (42 U.S.C. § 1986), and Count VII (willful disregard), summary judgment is **GRANTED** on consent.

On Count I (§ 1983), summary judgment is **DENIED** to defendant Egan, with leave to file a supplemental summary judgment motion as directed in Part III.C, but **GRANTED** to the other moving Defendants.

On Count III (§ 1985), Count VIII (assault and battery), and Ransom's crossclaim, summary judgment is **GRANTED** to the moving Defendants.

On Counts V and VI, summary judgment is **DENIED** to the extent Plaintiff brings a *Monell* claim against the City under a failure-to-discipline theory, but otherwise **GRANTED**.

An appropriate order follows.

Dated: April 22, 2021

/s/ Kevin McNulty
_____
Kevin McNulty
United States District Judge